**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT and ARREST WARRANT**

ROBERT KRAAIPOEL (DOB: 12/24/42)
AVIATION SERVICES INTERNATIONAL, B.V.
TPC, B.V.
DELTA LOGISTICS, B.V.

This affidavit is being submitted in support of a criminal complaint and an application for an arrest warrant relating to:

a.  ROBERT KRAAIPOEL, P.O. Box 418- 1700AK, Heerhugowaard, Netherlands; and three Dutch companies operated and controlled in part by ROBERT KRAAIPOEL and his son Niels Kraaipoel and all located or with mailing addresses in Heerhugowaard, Netherlands:

b.  AVIATION SERVICES INTERNATIONAL, B.V.;

c.  TPC, B.V.; and

d.  DELTA LOGISTICS, B.V.

I respectfully submit that there is probable cause to believe that ROBERT KRAAIPOEL, AVIATION SERVICES INTERNATIONAL, TPC, and DELTA LOGISTICS have committed the following criminal offenses in violation of United States law:
-- unlawfully and willfully exporting, reexporting, causing the export and reexport of goods from the United States to Iran without a license, as well as attempting to do the same, in violation of the International Emergency Economic Powers Act, 50 U.S.C. § 1705, and the Iranian Transactions Regulations, 31 C.F.R. §§ 560.203 and 560.204; and
-- false statements in violation of 18 U.S.C. § 1001.

## AFFIANT'S BACKGROUND

1.  I am a Senior Special Agent with the United States Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement.  I have been employed by the Department of Commerce as a Special Agent for eighteen years.  In the course of my duties, I am responsible for investigating violations of United States laws relating to the illegal export of commodities and technology from the United States.

2.  Prior to my position as a Special Agent with the Department of Commerce, Office of Export Enforcement, I was employed as a Special Agent with the United States Department of the Treasury, United States Customs Service, for approximately eighteen months.  As a Special Agent with the United States Customs Service I was responsible for investigating violations of law relating to the illegal importation of drugs and the illegal export of military commodities and technology.

3. Prior to my position as a Special Agent with the United States Customs Service, I was employed as a Special Agent with the United States Department of Justice, Drug Enforcement Administration, for approximately four years. As a Special Agent with the Drug Enforcement Administration, I was responsible for investigating violations of the United States drug laws.

4. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other federal law enforcement officials relating to this investigation. I have reviewed documents and interviewed witnesses during the course of this investigation. The statements contained in this affidavit are based on my own observations, witness interviews, document reviews and reliable information provided to me by other law enforcement officials. Because this affidavit is submitted for the purpose of seeking issuance of a criminal complaint and arrest warrants, it does not include every fact known to me concerning the investigation.

## EXPORT LAWS AND REGULATIONS

International Emergency Economic Powers Act and the Iranian Transaction Regulations

5. Pursuant to the authority under the International Emergency Economic Powers Act ("IEEPA"), the President of the United States and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods. Title 50, United States Code, Section 1705 provides:

> Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined . . . , or, if a natural person, may be imprisoned for not more than twenty years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

6. Pursuant to an Executive Order by President William Jefferson Clinton in 1995, the Secretary of the United States Department of Treasury, in consultation with the Secretary of State, promulgated the Iranian Transactions Regulations, Title 31, United States Code of Federal Regulations, Part 560. The Iranian Transactions Regulations generally prohibit any person from exporting or causing to be exported from the United States without a license any good or technology without having first obtained a validated export license from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC").

7. The Iranian Transactions Regulations imposed, among others, the following prohibitions:

Section 560.204 – Prohibition of any Sale or Supply of any

Goods, Technology, Services to Iran or the Iranian Government:

> Except as otherwise authorized [by a license issued by the Office of Foreign Assets Control of the U.S. Department of Treasury ("OFAC")], the exportation, . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited. . . .

Section 560.203 – Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Reports to the United States Government and the Automated Export System

8. Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings are filed electronically through the Automated Export System administered by the U.S. Department of Homeland Security, Customs and Border Protection, in Washington, D.C. The Shipper's Export Declaration ("SED") is one such required filing.

9. An essential and material part of the SED as well as other export filings is information concerning the end-user or ultimate destination of the export. In many cases, the identity of the end-user determines whether the goods may be exported without any specific authorization from the U.S. government, whether the goods may only be exported with the specific authorization or a validated license from the Commerce Department or Treasury Department, or whether the goods may not be exported from the U.S.

## FACTS SUPPORTING PROBABLE CAUSE

Background of Defendants and Other Participants

10. ROBERT KRAAIPOEL (DOB: December 24, 1942) is a citizen and resident of the Netherlands. He is the Director or principal officer of Aviation Services International B.V., a small Dutch company which supplies aircraft parts and related goods. As the Director or

principal officer, ROBERT KRAAIPOEL directs and controls the business of Aviation Services International.

11. AVIATION SERVICES INTERNATIONAL B.V. is an aircraft parts supplier in the Netherlands which was founded in 1986. The company is registered in the Netherlands with its principal offices located at Fleming Straat 36, 1704 SL, Heerhugowaard, the Netherlands. It is reported that Aviation Services International employs approximately six persons, including ROBERT KRAAIPOEL and his 38-year old son Niels Kraaipoel, who serves as the company's Sales Manager.

12. TPC, B.V. is a company registered in the Netherlands, reportedly owned by Niels Kraaipoel, the Sales Manager of Aviation Services International and son of ROBERT KRAAIPOEL, with a mailing address of P.O. Box 11, 1700AA Heerhugowaard, Netherlands. In March 2007, ROBERT KRAAIPOEL used TPC, B.V. to evade and avoid United States customs and export controls after U.S. government officials in January 2007 inspected and detained aircraft parts to be exported from the United States at the direction of Aviation Services International, which was believed to be operating on behalf of Iranian governmental agencies or companies.

13. DELTA LOGISTICS, B.V. is a company registered in the Netherlands, reportedly owned by Niels Kraaipoel, the Sales Manager of Aviation Services International and son of ROBERT KRAAIPOEL, with a mailing address of P.O. Box 11, 1700AA Heerhugowaard, Netherlands.

14. Lavantia, Ltd. is a trading company located at 16 Kyriakou Matsi Ave, 3rd Floor, 1082 Nicosia, Cyprus, and is suspected of serving as a purchaser of U.S. and other goods on behalf of Iranian businesses and governmental agencies.

**Summary of Investigation**

**A. November 2005 and January 2006 False Statements by ROBERT KRAAIPOEL relating to the Export of Communications Equipment – Counts One and Two of the Complaint**

15. On October 28, 2005, ROBERT KRAAIPOEL placed an order with DTC Inc. to purchase electronic communications equipment, specifically, two video receiver units – a model DVBR 1000S and a model DVBR 1000L – and a DVRPT-BC-XX-5000 video repeater. DTC Inc. is a U.S. company located in Nashua, New Hampshire. These items were sent for shipment to ACE International Freight Service ("ACE International") in Jackson, Georgia, to await export to Aviation Services International and Kraaipoel in the Netherlands.

16. On November 3, 2005, a DTC Inc. representative sent an e-mail to Niels Kraaipoel at Aviation Services International, requesting that he identify the end user(s) for the items as

required by United States law. On November 4, 2005, ROBERT KRAAIPOEL replied to the request, stating that the equipment was destined for Poland, for use by the Polish Border Control Agency. Such a purported end-use or destination did not require a validated license or specific authorization from the U.S. Commerce Department for the export by DTC Inc.

17. On or about November 5, 2005, the equipment was exported to Aviation Services International in the Netherlands. Prior to the equipment being exported, the freight forwarder for the shipment, ACE International, entered the required information concerning the end-user or ultimate destination of the export, i.e., Poland, into Automated Export System. The information entered in Automated Export System by ACE International was provided by ROBERT KRAAIPOEL and Aviation Services International and was used to prepare documents submitted to the United States Government in connection with the November 2005 export.

18. On November 18, 2005, ROBERT KRAAIPOEL and Aviation Services International sought to purchase additional communications equipment from DTC Inc. and sent to DTC Inc. a purchase order for three Model VML 5000- ENC video transmitters, three VMS2-5000-ENC video transmitters, and 15 model 701145-072 Microphones. On November 19, 2005, a DTC Inc. representative sent an e-mail to ROBERT KRAAIPOEL at Aviation Services International requesting end user information for this equipment. On November 22, 2005, ROBERT KRAAIPOEL replied, stating that this equipment was also destined for the Polish Border Control Agency.

19. The equipment was purchased by Aviation Services International and exported to the Netherlands on or about January 26, 2006. As with the November 2005 shipment, the freight forwarder, ACE International, filed a SED with the U.S. Department of Homeland Security, Customs and Border Protection, certifying Aviation Services International as the ultimate consignee. Separately, ROBERT KRAAIPOEL and Aviation Services International represented in a November 22, 2005, e-mail to DTC, Inc. that the ultimate end-user was the Polish Border Control Agency.

20. Subsequently, an official from the Federal Bureau of Investigation ("FBI") met with the Deputy Director of the Polish Border Guards, who advised that his agency did not have Un-manned Air Vehicles and, therefore, would have no need for this type of equipment. He further advised the FBI that his agency has had no current or past dealings with Aviation Services International.

21. On April 16, 2007, Tessa Kooig, an employee of ROBERT KRAAIPOEL and Aviation Services International, sent an e-mail to DTC, Inc., requesting a quote or the price to purchase spare parts for use in the communications equipment previously purchased by Aviation Services International and referenced above. On April 20, 2007, DTC, Inc. responded to the quote and requested end user information and certification for the equipment. On May 7, 2007, Tessa Kooig responded to DTC, Inc. with an e-mail and an attached letter from Lavantia Trading,

Ltd., a business purportedly located in Nicosia, Cyprus, representing that it would be the end user of the equipment.

**B. Export of more than 290 U.S. Origin Goods by Aviation Services International to Iran in 2006 – Count Three**

22. Dutch Customs officials and the U.S. Commerce Department currently have ongoing investigations of ROBERT KRAAIPOEL, Aviation Services International, and others in connection with unlawful exports to the Islamic Republic of Iran as well as other export activity. Dutch Customs officials have reviewed Dutch records of Aviation Services International and provided the resulting information in January 2007 to the United States' Immigration and Customs Enforcement Attaché in Rotterdam, Netherlands. Dutch Customs officials have informed United States officials in the Netherlands that Aviation Services International obtained more than 290 items, including parachutes, aircraft parts, aircraft paints, and industrial chemicals, from the United States and caused them to be shipped or transported to Iran in 2006.

23. Dutch Customs officials have provided U.S. officials a list of 348 exports of U.S. origin goods to Aviation Services International in the Netherlands during 2006. Dutch Customs officials reported that from in or about January 2006 through in or about December 2006 approximately 297 of the shipments from the United States to Aviation Services International were trans-shipped or reexported by Aviation Services International to businesses and government entities in Iran. The items destined for shipment to Iran by Aviation Services International included parachutes, aircraft parts, aircraft paints, and industrial chemicals. Dutch Customs officials reported that the U.S. origin goods sent to Iran by Aviation Services International were provided to, among others, Iran Aircraft Industries in Tehran, Iran; Iran Helicopter Support and Renewal Co. in Tehran, Iran; Heavy Metals Industries in Tehran, Iran; and Iran Aircraft Mfg., IND HESA in Isfahan, Iran. These organizations or companies are reportedly Iranian governmental agencies, procurement agencies for the Iranian government, or companies doing business in Iran.

24. Pursuant to IEEPA and the Iranian Transaction Regulations, it is unlawful to export or reexport any goods, technology or services from the United States to Iran, except publications and donations of articles intended to relieve human suffering, without a license issued by the Office of Foreign Assets Control – U.S. Treasury Department ("OFAC"), located in Washington, D.C. None of the U.S. origin items reported by Dutch Customs officials as having been exported to Iran from the U.S. and through the Netherlands by Aviation Services International consisted of such publications or articles intended to relieve human suffering.

25. On May 21, 2007, the Chief of the Enforcement Division of OFAC, advised the affiant that the OFAC central files for the period 2002 to the present had been reviewed and that no license had been granted to Aviation Services International authorizing shipments to Iran of the goods described herein or any other goods, including the parachutes, aircraft parts, aircraft

paints, and industrial chemicals which Dutch customs officials have reported that Aviation Services International has exported from the United States and on to Iran.

**C. January 2007 Attempted Export of Aircraft Parts**

26. On January 22, 2007, a consolidated shipment of aircraft parts destined for Aviation Services International in the Netherlands was stopped for inspection by officers of the Customs and Border Protection, U.S. Department of Homeland Security at the facility of ACE International Freight Service ("ACE International") in Jackson, Georgia. ACE International is a freight forwarding company which transports goods internationally. The aircraft parts included airspeed indicators, turn and bank indicators, bearing controls, rotor and vibration gear, and navigation equipment which had been purchased by Aviation Services International from Sun Aviation in Lawrence, Kansas; Honeywell in Phoenix, Arizona, Hamilton Sunstrand in Windsor Locks, Connecticut, and Gables Engineering in Coral Gables, Florida.

27. After being notified of the detention of the shipment, Niels Kraaipoel, the Sales Manager of Aviation Services International and son of ROBERT KRAAIPOEL, placed a telephone call to the Office of Export Enforcement, United States Department of Commerce, and was informed that Aviation Services International's shipment had been detained for inspection and for end user determination. Niels Kraaipoel stated that the aircraft parts being shipped were to be re-sold in Europe. When asked if any of the parts were destined for Iran, Niels Kraaipoel said that they were not. Niels Kraaipoel also stated that Aviation Services International did not have any business dealings with Iran. Niels Kraaipoel then stated that he was aware of the U.S. trade restrictions on Iran and reiterated that Aviation Services International did not have any dealings with Iran.

**D. April 2007 Export to Iran of Aluminum Sheets and Rods – Count Four**

28. On February 21, 2007, ROBERT KRAAIPOEL sent a purchase order or request from Aviation Services International in the Netherlands to an employee of Advance Aerospace Metals in Margate, Florida to purchase aluminum sheets and rods - Model 2024T-3. On March 28, 2007, ROBERT KRAAIPOEL telephoned the same employee of Advance Aerospace Metals to tell him/her that he still wanted to purchase the aluminum sheets and rods but that he wished to insert the name of a Netherlands company TPC, B.V. on the shipping and invoice documents. That direction by ROBERT KRAAIPOEL to insert the company named TPC, B.V. for Aviation Services International followed the detention of the recent shipment of aircraft parts destined to Aviation Services International that is described above in pagraraph 26.

29. According to Advance Aerospace Metals, the aluminum sheets and rods sought and purchased by Aviation Services International and ROBERT KRAAIPOEL were aerospace grade aluminum which is designed for the manufacture and repair of aircraft.

30. In or about April, 2007, Aviation Services International paid approximately $9,600 for and purchased the aluminum sheets and rods Model 2024T-3 from Advance Aerospace Metals located in Margate, Florida. The goods were shipped on or about April 6, 2007 upon ROBERT KRAAIPOEL's direction to DSV Air & Sea Freight Company ("DSV") in Miami, Florida to await export to the Netherlands. DSV was instructed by ROBERT KRAAIPOEL to list the country of ultimate destination as the Netherlands. DSV subsequently in April 2007 completed shipping documents, including an electronic shipper's export declaration, which was entered and filed by DSV in the computerized Automated Export System, which is maintained by the U.S. Department of Homeland Security, Customs and Border Protection, located in Washington, D.C. The information entered in the Automated Export System by DSV concerning the shipment of aluminum sheets and rods by Aviation Services International and ROBERT KRAAIPOEL listed the Netherlands as the ultimate destination.

31. On April 20, 2007, Dutch Customs officials reported to U.S. officials that the shipment of aluminum sheets and rods originating from Advance Aerospace Metals to Aviation Services International was detained by the Dutch Customs officials after Aviation Services International sought to ship the items to Iran.

32. On May 21, 2007, the Chief of the Enforcement Division of OFAC, advised the affiant that a check of the OFAC central files for the period 2002 the present had been reviewed and that no license had been granted to Aviation Services International authorizing shipments to Iran of the goods described herein or any other goods, including the aviation grade aluminum sheets and rods which were caused to be exported from the United States by Aviation Services International and ROBERT KRAAIPOEL.

**E.  Attempted Unlawful Export to Iran by ROBERT KRAAIPOEL and Delta Logistics, B.V. from March 2007 to July 2007 – Count Five**

33. On March 30, 2007, For Trade International ("F.T.I."), located in Lawrence, Kansas, attempted to export a shipment of 2-Mil-Kaptonn polymide film to DELTA LOGISTICS, B.V., a Netherlands corporation. The shipment was detained by U.S. officials when it was discovered that DELTA LOGISTICS, B.V. was operated, in part, by the same principal, ROBERT KRAAIPOEL, as Aviation Services International. ROBERT KRAAIPOEL from Aviation Services International was contacted by DSV and notified that an end-user statement would have to be provided before the shipment could be exported. Kraaipoel refused to provide this information and the polymide film remained in storage at the DSV facility in Elk Grove, Illinois.

34. In July 2007, Kathleen Hodge, Export Manager at F.T.I., received a telephone call from ROBERT KRAAIPOEL concerning the shipment of polymide film. Kathleen Hodge was informed by ROBERT KRAAIPOEL that he had a potential buyer for the polymide film and this customer was identified as Mojir Trading located in Dubai, United Arab Emirates. On July 9, 2007, F.T.I. received a purchase order and end user statement purporting to be from Ali Molaei, Managing Director of Mojir Trading, stating that the polymide film was destined for the U.A.E.

and would be used for sealing large electromotor fittings. The purchase order received by Ms. Hodge, clearly indicates that DELTA LOGISTICS, B.V., a company operated in part by ROBERT KRAAIPOEL, was directly involved in this transaction.

35. On August 1, 2007, the affiant sent an e-mail to the U.S. Department of Commerce Export Compliance Officer at the United States Embassy in Dubai, U.A.E. Mr. Khan was asked to contact Ali Molaei at Mojir Trading to verify both the order and the purported end use for the polymide film. On August 16, 2007, the Department of Commerce Export Compliance Officer determined that there was no listing in any business directories in Dubai for Mojir Trading. An inquiry was made with the building manager and head of security at the address listed for Mojir Trading and both reported that there were no records of an Ali Molaei or a business with the name Mojir Trading at that location. The Department of Commerce Export Compliance Officer then attempted contact Ali Molaei and Mojir Trading using the telephone and facsimile numbers provided to F.T.I. The Department of Commerce Export Compliance Officer Mr. Khan reported that both of these numbers were associated with the Al Shaheel Travel Agency. According to Department of Commerce Export Compliance Officer, no one at the Al Shaheel Travel Agency had ever heard of Ali Molaei or Mojir Trading.

36. The affiant understands that F.T.I. has informed ROBERT KRAAIPOEL of the above information and that ROBERT KRAAIPOEL has not sought to correct any information or provide any new information concerning the actual end-user of the polymide film. In light of the foregoing information as well as the initial refusal by ROBERT KRAAIPOEL to provide information concerning the end-user and information received from Dutch Customs officials concerning the more than 290 items from the United States transshipped in 2006 by Aviation Services International to Iran, I respectfully submit that the foregoing demonstrates another attempt by ROBERT KRAAIPOEL, Aviation Services International, and Delta Logistics, B.V. to export or reexport United States goods, namely the polymide film, to Iran in violation of U.S. law.

## CONCLUSION

Based on the facts set forth herein, and on my experience and training in investigating cases involving violations of federal law and other experienced agents with whom I have consulted, I submit there is probable cause to believe that ROBERT KRAAIPOEL, Aviation Services International, TPC, Delta Logistic have committed the following offenses: exporting, reexporting, attempting to export and reexport, and causing the export and reexport of goods to Iran without a license, and attempting to do the same, in violation of 50 U.S.C. § 1705 (IEEPA) and Title 31, United States Code of Federal Regulations, Parts 560.204 and 560.203; and false statements in violation of Title 18, United States Code, Sections 1001 and 2.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
DAVID J. POOLE, SENIOR SPECIAL AGENT
OFFICE OF EXPORT ENFORCEMENT
BUREAU OF INDUSTRY AND SECURITY
U.S. DEPARTMENT OF COMMERCE

Subscribed to and sworn before me on this _____ day of August 2007.

_____
UNITED STATES MAGISTRATE JUDGE